MAGGIE DILLENBERGER, PLAINTIFF, DEFENDANT IN ERROR, v. LEVI WEINGARTNER ET AL., DEFENDANTS, PLAINTIFFS IN ERROR.

Argued December 5, 1899—Decided March 5, 1900.

1. The obvious dangers, the risks which are assumed by the servant in his master's employment, are such risks as he becomes acquainted with in such employment. He is bound to use his eyes to see that which is open and apparent to any person using his eyes, and if he fails to do so he cannot charge the consequences upon his master, for such a risk is impliedly assumed by him.

2. The doctrine of the assumption of obvious risks by the servant applies as well to those which arise or become known to the servant during the service as to those in contemplation by the original hiring.

3. A female employe of the age of thirty-two years, engaged in a factory for ironing and pressing corsets, attempted to lower the sash in the frame of a window, behind a revolving fan, in another frame, slightly projecting into the room in which she was engaged. She was well acquainted with the manner of the operation of the fan, and of the

danger of drawing down the sash of the window whilst the fan was in motion; she saw it was revolving rapidly, and in her attempt to open the sash, either by mistake, the slipping of the hand or by placing her hand through the spaces in the fan, it came in contact with the flanges of the moving fan. It appeared that the safe way was to put the hand up behind the fan and take hold of the sash and pull it down, and if it was attempted to be done by putting the hand through between the rim of the fan and the frame thereof, in front of the sash, it was unsafe and dangerous. *Held,* that the danger in pulling down the sash was an obvious one, and that no liability of the master could be predicated upon an injury resulting from the work of lowering such sash.

On error to Essex Circuit Court. This case was tried April 17th, 1899, before Judge Child and a jury, and a verdict rendered for the plaintiff for $3,500.

For the plaintiff in error, *Lewis Hood, George Holmes* and *William D. Edwards.*

For the defendants in error, *Samuel Kalisch.*

The opinion of the court was delivered by

LIPPINCOTT, J. The plaintiff sues the defendants to recover damages for personal injuries inflicted on her on the 4th day of January, 1897, while she was engaged in the factory of the defendants, in endeavoring to lower the sash of a window, in the frame of which there was a steam revolving fan. She alleges that she was injured by reason of her hand coming in contact with the fan. Her left hand was much cut and she lost her thumb and some fingers, and her hand was otherwise injured.

The plaintiff was a servant in the employment of the defendants. She was about thirty-two years of age, and employed as a presser or ironer of corsets in the factory of the defendants. The evidence shows that she had been employed there about six months, and was thoroughly acquainted with the manner in which the work was performed, and the operation of the fan. She was engaged in two rooms of the factory; one was the ironing-room and the other was a sprink-

ling, dampening or steam-room. In this latter room there was a sink at which corsets were dampened by hot water or steam before being pressed or ironed. The ironing-room was the larger of the two rooms, the steam-room being separated from the ironing-room by a wooden partition, and was about twelve feet in length by about four feet in width. In this room were two wooden steam-troughs along the west side, one of which was immediately in front of and below a window which was at one end of this room, in the wall thereof, leading into the open air. The steam-trough under this window was about four feet high, and about three feet wide, and the sides being about an inch thick. The upper sash of this window was the inside one in the window frame, and the lower sash the outside one. The upper sash had in front of it, on the inside, a revolving fan in its frame, for the purpose of discharging the steam from the room, and the fan, with the frame, covered the whole of the upper sash, but unconnected with it, and leaving a space of about a foot or a little less between the fan and its frame and the upper sash—that is, projecting that far into the room; the upper sash was movable up and down, so that it might be opened when the fan was in motion, for the purpose of discharging the steam from the room. Overhanging the trough there was a steam-jet, which was used by the ironers for the purposes of dampening the corsets before they were ironed. The ironing-room was large enough to accommodate between twenty and thirty ironers, but the steam-room, with its two troughs, was only large enough for two ironers at one time. All the evidence on this subject shows that about ten minutes' work at the steam-jet will dampen enough corsets to keep a hand busy for more than an hour, and each of the ironers so engaged take their turn in the steam-room to dampen the corsets upon which they are at work. When the machinery in the factory is set going in the morning it causes the fan to revolve also. It makes over seven hundred revolutions per minute, and its operation by reason of its noise and motion is distinctly observable by all employed in the room. It is also in plain

view, as well as the space between it and the upper sash of the window. The plaintiff had been employed at her work in this room and the pressing-room adjoining for over six months, and was daily, several times a day, engaged in this steam-room in which the accident happened.

On the morning of this accident the plaintiff, with another woman, went into this room as soon as they came into the factory, with corsets to be dampened at the steam-jet. The plaintiff took her corsets to the steam-jet, over the trough, above which the revolving fan in the window was placed. The steam was shut off and the fan was in operation, and the upper sash of the window was closed. She turned the steam-jet to go to work, when she noticed that the upper sash of the window was closed. She turned off the steam and then undertook to lower this sash of the window for the purpose of affording an escape of the steam which would come from the steam-jet, and in endeavoring to do so she put her hand, either wholly or partly, into the fan, and it was injured very severely.

The evidence on the part of the plaintiff shows, during her employment in this factory, she had seen this fan in daily operation. She saw the fan put in its frame in the window and had observed its operation from day to day, and she knew it was dangerous for anyone to put the hand into it, through it or to touch it. She saw that there were flanges with spaces between them, and that when it was revolving it looked as if there was a space between the rim of the moving fan and the inside of its frame, but she knew, also, that this space was a deceptive one. She also was entirely aware of its location in respect to the space between the fan and the sash.

When she attempted to lower the upper sash behind the fan, she testifies that she saw it was revolving and going very fast. She says that there was but little or no steam in the room at that time.

She is, in parts of her evidence, uncertain of the manner in which she attempted to take hold of the sash of the window

behind the fan to lower it, or whether she took hold of it at all. She knew that there existed the space between the upper window sash and the frame of the fan, and that the proper way to lower it was to reach below the frame of the fan, take hold of the sash and pull or push it down, and thus the hand would be entirely free from any contact with the fan in front of the sash.

She says that she had never attempted to open the window before this time, that it was the work of the first woman who arrived in that room in the morning, and that she was the first one to arrive this morning.

There is other evidence that it was not a part of her work to open the window, that it was the work of the foreman of the defendants, and that when it was necessary to have the window opened he was called to open it. However that may be, this case is treated as if the opening of the window was a part of the work of this plaintiff or of her co-servants engaged with her in this employment.

In order to draw down the upper sash, she testifies that she kneeled on both knees upon the rim of the trough at which she was standing and working, and braced herself with her right hand against the partition, and with her left hand reached up to lower the upper sash. She testifies further that she cannot tell how her hand slipped into the fan, and that when she was hurt she did not have hold of the sash of the window. Again, she testifies that she could see the whole frame of the upper sash. Again, she says she could not see it because the fan was running "so quick." After the jury had taken a view of the premises, she being there with the jury, and, seeing the fan in the window, she is recalled, and the following questions were put to her:

"*Q.* Since you have seen the fan in the window, has it recalled to your memory where it was you took hold?

"*A.* Well, I took hold of the frame of the fan; I thought that was the frame of the window, so I took hold of the frame of the fan."

And again:

"*Q.* Did you put your hand on the wooden frame?

"*A.* Yes, sir; just to push it down.

"*Q.* On the wooden frame?

"*A.* Yes, sir.

"*Q.* Couldn't you see that was the frame of the fan?

"*A.* No, I couldn't see that; I always thought it was the frame of the window."

Mary Kelleher, a witness for the plaintiff, testifies that when the fan was revolving swiftly there appeared to be a space of about three inches between the outer rim of the fan and the frame in which the fan was set, behind which the upper sash of the window was set. She also says that she often lowered this sash; that it was often done by the other women employed there; that it was very plain how it should be done, and that was to pull it down from the bottom of the sash by taking hold of the sash behind the fan, and that it could not be done by putting the hand through the space between the rim of the fan and its frame.

The evidence on the part of the defendants is directed to the proof of the situation of the fan, its frame and the window sash behind it, the distance between the fan and the window sash, and the manner in which it could be safely opened by reaching up behind the fan, and taking hold of the sash and drawing it down; that it could be drawn down safely; that the danger of coming in contact with the fan, or of attempting to put the hand through the apparent space between the frame and the rim of the fan, to pull the sash of the window down, was plainly to be seen; also tending to establish that the lowering of this sash was not a part of the plaintiff's work, and that she with other women at work in these rooms were told not to attempt to lower the window, but that when it was thought necessary by them to have it lowered, to call the foreman, who would do it.

There is no evidence on the part of the defendants in aid of the plaintiff's case, and this evidence raises many questions of fact in defence of this action, which, if they were material to the determination of the case, would be required to be submitted to the jury.

A motion to nonsuit was made and refused, and at the close of the case the trial court was requested to direct a verdict for the defendants. This request was refused. Exceptions were taken to the refusal to nonsuit and to direct a verdict.

The question therefore is presented whether the case upon the whole of the evidence should have been withdrawn from the jury and a verdict directed for the defendants.

This is only done when the facts are undisputed, or from the whole of the evidence the only reasonably legitimate inference which can be drawn is that no liability has been established. The question must not be open to fair debate. *Johnson* v. *Devoe Snuff Co.*, 33 *Vroom* 417, and cases cited.

The only question of which there is any need of discussing is whether the danger to which the plaintiff subjected herself was an obvious one, and this must be stated and discussed upon the assumption that if a recovery depended upon the solution of any other question, the case should have been submitted to the jury for its determination.

The general rule is that the master is bound to exercise reasonable care to provide a safe place for his servant to perform his work, and to furnish and adopt such means that he may be assured reasonable safety and protection in his work, and to exercise reasonable care to maintain the place and means reasonably safe. The qualifications to this rule are that the workman takes upon himself, during the continuance of his employment, all the risks and dangers which are obvious to him or can be perceived by him in the exercise of his senses and the use of ordinary care and circumspection. *Belleville Stone Co.* v. *Mooney*, 32 *Vroom* 253; *Comben* v. *Belleville Stone Co.*, 30 *Id.* 226; *Van Steenburgh* v. *Thornton*, 29 *Id.* 160; *Regan* v. *Palo*, 33 *Id.* 30.

In this case the danger to which the plaintiff was subjected was an obvious one in the sense in which the law uses that term. She was an adult. She must be considered as having entire acquaintance with the operation of this fan. She saw it being operated. She knew its operation and the necessity of the upper sash being lowered behind it, to afford egress to

the steam in the room into the open air. There was nothing concealed—no latent danger whatever. She knew how to open the window. She knew that she must reach up behind the fan to open the window. She knew that she must not put her hand through the fan to draw the sash down. When she attempted to open the window behind the fan she saw that it was revolving very rapidly. Her observation was such that she describes it fully in her evidence. She knew that if she put her hand in it or through the spaces between the flanges, or through the space between the rim of the fan and its frame, she would be injured. This was obvious to her senses, whether she at that time thought about it or not. The evidence is that the fan and its frame covered the whole of the upper sash of the window. This is clear in the evidence on both sides. It was entirely obvious that the frame of the fan could not be the frame of the upper sash, which she was to take hold of to lower it. I think it is clear that it was apparent to her, if she chose to observe, that in order to lower the sash it was necessary to reach up behind the fan and its frame, and thus take hold of the sash, in the space which existed there, and pull it down. It was apparent that it could be done in no other way, and that in this way it was entirely safe, and that in any other manner it was dangerous and unsafe. She in one instance testifies, as has been already stated, that she mistook the frame of the fan for the frame of the window, but even if this be so, still the risk was that of an obvious danger. She denies that she slipped from the rim of the trough and thus fell into or caught the fan with her hand, and therefore the irresistible inference is that she was injured by putting her hand between the flanges or wings of the fan, or between the fan and the inside of the rim of the frame in which it was set. Obviously there existed danger at these points of contact. It was a danger entirely obvious in its character.

The obvious dangers are those which are apparent. They are the apparent risks of the work. They are the risks which are apparent in the exercise of ordinary observation

and which are disclosed by the use of the eyes and other senses. If the servant fails to observe what is obvious and suffers, he cannot charge the consequences upon his master. The risk so taken is impliedly assumed by him. 14 *Am. & Eng. Encycl. L.* (2d ed.) 842; *Foley* v. *Electric Co.,* 25 *Vroom* 411; *Chandler* v. *Electric Railway Co.,* 32 *Id.* 380. In contemplation of law her undertaking to assume the apparent risk of the work is general and unqualified. *Foley* v. *Electric Co.,* 25 *Id.* 411, 414. A like knowledge of dangers by the servant with the master of the dangers absolves the master from liability. *Regan* v. *Palo,* 33 *Id.* 30. If the dangers are incident and obvious, however extraordinary they may be, the servant is without remedy against the master. *Ibid.* If he fails to see that which is an obvious danger and suffers, he cannot charge his master. *Walsh* v. *St. Paul Railroad Co.,* 27 *Minn.* 367; *Crown* v. *Orr,* 140 *N. Y.* 450, 453; *Curley* v. *Hoff,* 33 *Vroom* 758, 765. She knew and saw that the fan was dangerous—that it was not guarded from the front. With this knowledge she attempted to open this sash of the window by placing her hand in or through the fan and was injured, and she cannot recover. *Taylor* v. *Manufacturing Co.,* 140 *Mass.* 150; *Conway* v. *Furst,* 28 *Vroom* 465.

The doctrine of the assumption of obvious risks by the servant applies as well to those which arise or become known to the servant during the service as to those in contemplation by the original hiring. *Johnson* v. *Devoe Snuff Co.,* 33 *Vroom* 417.

Applying well established principles governing the relation of master and servant, the conclusion reached is that the injuries involved in this action arose alone from the incidental and obvious risks of her employment, and that these were dangers so clearly incidental and obvious as not to leave the matter open to debate.

The trial court, upon these grounds, should at the close of the case have directed a verdict for the defendants.

The judgment therefore must be reversed and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—THE CHIEF JUSTICE, DEPUE, VAN SYCKEL, DIXON, GARRISON, LIPPINCOTT, GUMMERE, LUDLOW, COLLINS, BOGERT, · NIXON, HENDRICKSON, ADAMS, VREDENBURGH. 14.